**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0785n.06

**No. 12-1051**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| ROBERT WELLS, | ) | **FILED** |
|  | ) | ***Aug 26, 2013*** |
| Plaintiff-Appellant, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
| CITY OF DEARBORN HEIGHTS; et al., | ) | COURT FOR THE EASTERN |
|  | ) | DISTRICT OF MICHIGAN |
| Defendants-Appellees. | ) |  |

---

**Before:** **BOGGS and WHITE, Circuit Judges; and McCALLA, District Judge.**[*]

BOGGS, Circuit Judge. On February 12, 2008, officers from the Dearborn Heights police department executed a search warrant at the home of Robert Wells. Upon entering the house, officer Patrick Mueller, accompanied by officers Timothy Ciochon and Christopher Pellerito, took Wells to the ground, handcuffed him, and tased him. Wells and the officers have offered differing accounts of the manner in which Mueller brought Wells to the ground and the point in time at which Mueller used his taser. A subsequent search of the house revealed marijuana, various drug paraphernalia, and methadone pills. Wells later pled guilty to possession of marijuana.

In February 2010, Wells brought suit in the United States District Court for the Eastern District of Michigan, alleging claims against sixteen Dearborn Heights police officers and the City

---

[*] The Honorable Jon P. McCalla, Chief United States District Judge for the Western District of Tennessee, sitting by designation.

of Dearborn Heights (the City). Wells later abandoned his claims against thirteen of the sixteen police officers, and the district court dismissed these claims with prejudice, leaving only the three officers who were most directly involved in his handcuffing and tasing    Mueller, Ciochon, and Pellerito    and the City as defendants. The district court granted the defendants' motion for summary judgment, and Wells now appeals. For the reasons that follow, we reverse the district court's grant of summary judgment to Mueller to the extent that the claims against him are based on the tasing of Wells and affirm all other decisions of the district court regarding Mueller. We also affirm the district court's grant of summary judgment to Ciochon and Pellerito on all counts. Finally, since the district court dismissed Wells's claim against the City purely on the ground that he had failed to state a constitutional claim against the defendant officers, we remand Wells's claim against the City in light of our decision regarding Mueller.

**I**

**A**

The incidents from which this suit arises occurred during the February 12, 2008, execution of a search warrant authorizing the search of Wells's home and seizure of, *inter alia*, all controlled substances, drug paraphernalia, "and any person(s) present at the residence." The officers conducting the search were provided with an incident-risk assessment, which rated the execution of the search warrant as "Risk Level 3 (High)" on a three-level risk scale. Specifically, it disclosed that Wells had a criminal history, including convictions for both assault with a deadly weapon and resisting and obstructing a police officer, and that his father, Randall Wells, who lived at the same residence, was on probation and had a suspected gang affiliation. In addition, the officers knew that

there were two fairly large dogs inside the home. The officers approached the door, which was fortified with bars, announced their presence, and then made a forced entry using a battering ram.[1]

The events after this point are controverted. The various depositions of defendants-appellees indicate that officer Patrick Mueller entered the residence first, followed by officers Timothy Ciochon and Christopher Pellerito, and that one of the two dogs, a bulldog weighing approximately 80 pounds, came growling towards Mueller, teeth bared. According to defendants-appellees, Mueller shot the dog, only once, when it lunged at and tried to bite his leg. Mueller then claims that Wells became enraged at the shooting of the dog and approached Mueller. When Wells allegedly ignored Mueller's instructions to "drop to the ground" and pushed aside Mueller's outstretched hand, Mueller kicked him, but Wells continued to advance. Mueller recounts that he then kicked Wells a second time, knocking him to the ground. According to Mueller, once Wells was on the ground, Wells began to kick Mueller and tried to stand back up, prompting Mueller to tase Wells in the abdomen. Mueller claims that he handcuffed Wells only after Wells had been tased.

Wells tells a somewhat different story. According to him, upon entering the house Mueller ordered Wells and his father to drop to the ground, and both of them immediately complied. Wells claims that he had difficulty lying down because of his cerebral palsy and that he first knelt on the floor and then placed his hand on a nearby love seat to help him get to the ground. In response, Mueller allegedly kneed Wells in the back, which put Wells completely on the ground, and

---

[1] There is some inconsistency in the record as to whether the officers knocked and announced their presence, simply announced their presence, or did not provide any notice before breaking down the door. Since Wells does not challenge the legality of the officers' entry, however, this dispute is not relevant to the instant appeal.

proceeded to handcuff him. Next, while Wells and Randall claim they were lying compliant on the ground, Mueller shot the Wellses' 80-pound American bulldog when it started barking at the officers. The dog allegedly made no physical contact with any officers, though the officers were kicking the dog to try to move it out of the way. Upon hearing Mueller shoot the bulldog, Wells turned his head, thinking his father had been shot. He also shouted, "you fucking pigs, you shot my dad," and then, upon seeing that it was the dog that had been shot, called the officers "fucking pigs" several more times. While he was shouting at the officers, Wells also recounts that he was "turning my body around, all the way around[,] trying to get on my back and my butt just to see what was going on." Wells claims that as he was turning, Mueller tased him "right in my hip, right where my butt cheeks are." Though at one point in his deposition Wells stated that he "jumped to turn around," he later clarified that, at the time he was tased, he had merely rolled onto his side and lifted his head off the ground to look around. He further asserts that he was not flailing around or kicking at the officers and that at no point did he attempt to stand.

After these events, Wells was taken outside and placed in a police car. A search of the house revealed marijuana, various drug paraphernalia, and methadone pills. Wells and his brother, Thomas, who was present in another room and also lived at the house, later pled guilty to possession of marijuana, and Randall pled guilty to possession of a controlled substance.

**B**

On February 9, 2010, Wells brought suit in the United States District Court for the Eastern District of Michigan, alleging claims against sixteen Dearborn Heights police officers for: (1) use of excessive force, in violation of 42 U.S.C. § 1983; (2) assault and battery, in violation of Michigan

tort law; and (3) gross negligence, in violation of Michigan tort law. In addition, Wells sued the City of Dearborn Heights for what he characterizes as "failure to train / supervise officers," in violation of 42 U.S.C. § 1983. Wells later abandoned his claims against thirteen of the sixteen police officers, and the district court dismissed these claims with prejudice, leaving only officers Mueller, Ciochon, and Pellerito and the City as defendants.

The remaining defendants moved for summary judgment. The district court, viewing the facts in the light most favorable to Wells, found that all defendants were entitled to summary judgment. Beginning with the § 1983 claim against Mueller, Wells challenged two discrete actions    Mueller's kneeing him to the ground and Mueller's tasing him while handcuffed. The district court dealt with the tasing first, holding that, even accepting Wells's version of the events as true, Mueller did not use excessive force and thus was entitled to qualified immunity. The district court distinguished *Roberts v. Manigold*, 240 F. App'x 675 (6th Cir. 2007), a case finding excessive force when an individual was completely pinned to the ground by one officer and repeatedly tased by another, by noting that Wells was struggling and calling Mueller a "fucking pig" and that Mueller expended only one taser cartridge. It emphasized that Mueller knew that Wells had a prior conviction for assaulting a police officer. The district court also found that Mueller did not use excessive force when he kneed Wells to the ground, noting that it was reasonable for him to suspect that Wells was not complying or even that he was looking for a weapon. It thus held that Mueller was entitled to qualified immunity for this action as well.

Moving to Ciochon and Pellerito, the district court held that they could not be held liable under § 1983 for failing to intervene. The court noted that while the Sixth Circuit has allowed

§ 1983 claims against officers who fail to stop the ongoing use of excessive force, even under Wells's version of the facts, Muller's application of force occurred so quickly that Ciochon and Pellerito could not have done anything to prevent it. Thus, the district court held that Ciochon and Pellerito could not be held liable for their failure to intervene and were entitled to qualified immunity.

With respect to the state-law claims, the district court held that Mueller could not be held liable for assault and battery because, as it found earlier, his actions during his encounter with Wells were objectively reasonable under the circumstances and thus were permissible under Michigan tort law. In addition, the district court held that Mueller, Ciochon, and Pellerito could not be held liable for gross negligence, again because their actions were objectively reasonable given the circumstances.

Finally, the district court dismissed Wells's § 1983 claim against the City for failure to train / supervise its officers, noting that because Wells had not shown that any of the individual defendants violated his constitutional rights, he could not maintain a claim of municipal liability against the City.

Wells now appeals the district court's grant of summary judgment for all defendants.

**II**

"We review a district court's decision granting summary judgment de novo." *Vance v. Wade*, 546 F.3d 774, 781 (6th Cir. 2009) (internal quotation marks omitted). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for

summary judgment, this court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario, Ltd*., 224 F.3d 797, 800 (6th Cir. 2000). In qualified-immunity cases, if "the defendant disputes the plaintiff's version of the story, the defendant must nonetheless be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Berryman v. Rieger*, 150 F.3d 561, 563 (6th Cir. 1998).

## III

## A

Section 1983 creates a private right of action against a state official who deprives an individual of his constitutional rights under color of state law. 42 U.S.C. § 1983. Civil liability, however, does not attach simply because a court determines that an official's actions were unconstitutional. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). This inquiry is not sequential, and we may assess either requirement first. *Pearson v. Callahan*, 555 U.S. 223, 236 37 (2009).

Because "[q]ualified immunity is an affirmative defense . . . [t]he defendant bears the burden of pleading" it in the first instance. *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002). The burden then shifts to the plaintiff, who must show that the official violated a right so clearly established "that every reasonable official would have understood that what he [was] doing violate[d] that right." *al-Kidd*, 131 S. Ct. at 2083; *Sheets*, 287 F.3d at 586. The plaintiff "bears the ultimate burden of proof to show that the individual officers are not entitled to qualified immunity."

*Garretson v. City of Madison Heights*, 407 F.3d 789, 798 (6th Cir. 2005). If the plaintiff fails to carry this burden as to either element of the analysis, qualified immunity applies and the state official is shielded from the plaintiff's suit.

**B**

Wells first alleges that Mueller used excessive force when he kneed him to the ground and when he tased him while handcuffed. Operating with Wells's version of the facts, the district court found that officer Mueller did not use excessive force, either in kneeing Wells to the ground or tasing him while handcuffed, and thus that Mueller was entitled to qualified immunity because he did not commit a constitutional violation.

"The Fourth Amendment prohibits the use of excessive force by arresting and investigating officers." *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006). In evaluating whether this prohibition has been violated, we employ an "objective reasonableness" test, which requires us to determine "whether the officers' actions [we]re 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "The test is fact specific, not mechanical, and the three most important factors for each case are: (1) the severity of the crime at issue; (2) the threat of immediate danger to the officers or bystanders; and (3) the suspect's attempts to resist arrest or flee." *Wysong v. City of Heath*, 260 F. App'x 848, 854 (6th Cir. 2008).

Furthermore, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. And our inquiry must be conducted with "allowance for the fact that

police officers are often forced to make split-second judgments    in circumstances that are tense, uncertain, and rapidly evolving    about the amount of force that is necessary in a particular situation." *Id*. at 397.

With these standards in mind, we agree that Mueller's first challenged action, kneeing Wells to the ground, was objectively reasonable.   The Supreme Court has acknowledged that "the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence," *Michigan v. Summer*, 452 U.S. 692, 702 (1981), and thus that the detention of occupants in the place to be searched, through the use of reasonable force, is constitutional, *see Muehler v. Mena*, 544 U.S. 93, 98 (2005).   In this case, Mueller was justified in attempting to detain Wells at the outset of the search, and Wells's apparent failure to drop to the ground quickly enough provided him adequate justification to knee Wells to the ground. *Cf. Dunn v. Matatall*, 549 F.3d 348, 354 (6th Cir. 2008) (holding that when a suspect "appeared recalcitrant in complying with the Officer's commands," the officers involved "acted reasonably in attempting to neutralize a perceived threat" by forcibly pulling him from his car and taking him to the ground).

Although Wells has proffered a reason for his slow response    his cerebral palsy    we must judge Mueller's actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, and thus cannot charge Mueller with knowledge that he did not possess, *see Wysong*, 260 F. App'x at 855 n.4 (emphasizing that even if a suspect's resistance is caused by a medical condition and could "not have been the product of a conscious decision, . . . the officers did not know this" when determining what force was reasonable).   From Mueller's perspective, Wells's failure to respond immediately could have been

interpreted as his resisting arrest, and Wells's reaching his arm out to lean on the love seat could have suggested to a reasonable police officer that Wells was searching for a weapon. *Cf. Dunn*, 549 F.3d at 354 (noting that the officers could have been apprehensive that the suspect had a weapon). These conclusions are all the more reasonable given Wells's criminal background, especially his history of resisting the police. Thus, even under Wells's version of the facts, Mueller did not use excessive force in kneeing Wells to the ground after Wells failed to immediately comply.

Moving to Mueller's tasing of Wells, we find that, taking Wells's story as true, Mueller did indeed employ excessive force. According to Wells, Mueller tased him *after* he was handcuffed and lying on the ground. Wells recounts that once he was on the ground, he shouted profanities at Mueller and attempted to "turn[] my body around, all the way around[,]trying to get on my back and my butt just to see what was going on." Although Mueller claims that Wells also was kicking at him and trying to stand back up, Wells specifically denies kicking Mueller or attempting to regain his footing. Thus, because there is a genuine dispute of material fact concerning the circumstances surrounding Mueller's tasing of Wells, we must resolve this dispute in favor of Wells at this stage of the litigation and assume that it was only Wells's attempt to roll over, while handcuffed and still lying on the ground, that prompted Mueller to tase him.[2] Based on this version of the facts, it was unreasonable for Mueller to tase Wells.

---

[2] Defendants-appellees also cite to the deposition of Wells's brother, in which he claims that Wells was having a seizure during the arrest, for support that Wells was struggling with the officers. It is clear, however, that Wells did not have a seizure during this encounter. Furthermore, to the extent that the deposition at issue otherwise contradicts Wells's own deposition testimony, this is merely another genuine dispute of material fact that we resolve in favor of Wells at this point in the litigation.

The district court, relying heavily on the fact that Wells was shouting profanities at the officers and "attempting to turn around onto his back," concluded that Wells "was not complying with the officers' orders to stop struggling and remain on the ground" and thus that the tasing was reasonable. But this circuit's "prior opinions clearly establish that it is unreasonable to use significant force on a restrained subject *even if some level of passive resistance is presented*." *Meirthew v. Amore*, 417 F. App'x 494, 499 (6th Cir. 2011) (emphasis added) (finding excessive force when an officer attempting to search a handcuffed but still belligerent suspect used an arm-bar takedown to bring her to the ground). This is especially true when the suspect is already handcuffed. *See Michaels v. City of Vermillion*, 539 F. Supp. 2d. 975, 985 (N.D. Ohio 2008) (noting the "well-established" rule that "the gratuitous use of force on a suspect who has already been subdued and placed in handcuffs is unconstitutional" and collecting this circuit's cases to that effect (internal quotation marks omitted)). And there are a number of cases explicitly addressing the illegality of using "non-lethal, temporarily incapacitating force [such as a taser] on a handcuffed suspect who no longer poses a safety threat, flight risk, and/or is not resisting arrest." *Id*. at 985 86 (collecting cases).

Here, Wells's version of the events is that he was handcuffed and on the ground, that he only tried to turn over to see what was going on, and that he never lifted anything more than his head off the ground. True, Wells did curse at the officers, but viewing these actions from the perspective of a reasonable officer, it does not appear that Wells posed a safety threat or a flight risk. And to the extent one might think he was continuing to resist arrest, Wells's actions could not reasonably be viewed as anything more than passive resistance. *See Bultema v. Benzie Cnty.*, 146 F. App'x 28,

- 11 -

35  36 (6th Cir. 2005) (finding excessive force when officers used pepper spray on a handcuffed suspect who was originally noncompliant and who "continued to struggle and squirm while handcuffed" but who was "clearly not a threat to anyone's safety nor . . . attempting to evade arrest by flight"); *see also Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 498 (6th Cir. 2012) (holding that the tasing of a handcuffed suspect was excessive force when there is no danger of the "potential escape of a dangerous criminal or the threat of immediate harm").

In fact, in a similar situation, this circuit held that kicking a handcuffed arrestee's legs out from underneath him when he jumped up from the ground was a use of excessive force. *See Smoak*, 460 F.3d at 783. In *Smoak*, the suspect, according to his version of the facts, was compliant and handcuffed and on the ground when an officer shot his family's dog. Upon witnessing the shooting, he immediately jumped to his feet, at which point the officers knocked his legs out from under him, forcing him back to the ground. *Ibid*. Reviewing these facts, the court held that "[a] jury could find that a reasonable officer would not have reacted this forcefully to a handcuffed man who showed no signs of noncompliance until his pet was killed in front of his family." *Ibid*. Wells's version of the facts mirror this situation; he claims he was compliant, that he was cuffed and on the ground, and that he then tried to turn around to see what was happening when he heard a gunshot and realized that his dog had been shot. True, Wells was angrily shouting at the officers, a circumstance not present in *Smoak*, but he also was still on the ground, which makes this scenario somewhat less dangerous than that in *Smoak*, where the suspect jumped to his feet. And the use of a taser is an even more severe application of force than simply knocking someone back to the ground.

In sum, viewing the facts in the light most favorable to Wells, Mueller's use of a taser was not objectively reasonable and constituted excessive force. In addition, given the abundance of Sixth Circuit precedent addressing the use of force on handcuffed individuals, much of which was established prior to February 2008, *see e.g.*, *Smoak*, 460 F.3d at 783 (2006); *Bultema*, 146 F. App'x at 35 36 (2005); *see generally Michaels*, 539 F. Supp. 2d at 985 86 (citing numerous cases to this effect, all of which were decided prior to 2008), we hold that a jury could find that Mueller's tasing of Wells violated a constitutional right so clearly established "that every reasonable official would have understood that what he [was] doing violate[d] that right," *al-Kidd*, 131 S. Ct. at 2083. Accordingly, Mueller is not entitled to summary judgment on the basis of qualified immunity on Wells's § 1983 excessive-force claim, but only with respect to his tasing of Wells.

## C

Wells also alleges that Ciochon and Pellerito violated his Fourth Amendment right to be free from excessive force when they failed to stop Mueller from using excessive force on Wells. The district court found that, viewing the facts in the light most favorable to Wells, the events in this case "occurred rapidly" and did not involve "ongoing excessive force, like repeated tasering or beating." Thus, it held that even if Mueller's actions constituted excessive force, "Ciochon and Pellerito could not have done anything to prevent the commission of the acts."

"This court has held . . . that a police officer who *fails* to act to prevent the use of excessive force may still be held liable where (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Floyd v. City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008)

(internal quotation marks omitted). In this circuit's first clear endorsement of "failure to intervene" liability under § 1983, *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982), we found that officers could be held liable under § 1983 for standing by idly while other officers repeatedly beat and kicked a suspect and dragged him down an alley. We have also made clear, however, that officers cannot be held liable under this theory if they do not have "a realistic opportunity to intervene and prevent harm." *Ontha v. Rutherford Cnty., Tenn.*, 222 F. App'x 498, 507 (6th Cir. 2007).

In the instant case, the force to which Wells was subjected occurred at two discrete, fleeting points in time    the kneeing and the tasing    denying Ciochon and Pellerito the opportunity to intervene and prevent any harm. By Wells's own admission, the encounter with Mueller was rapid. In his deposition, he indicated that he was lying on the ground within two seconds of the door being broken down. Thus, even assuming that Mueller used unreasonable force in bringing Wells to the ground and cuffing him, there was no way Ciochon or Pellerito could have intervened. Similarly, when Mueller later tased Wells, he did so only once, engaging in no extended string of abuses. In the absence of ongoing, repeated tasing, there was no way for Ciochon or Pellerito to intervene and prevent harm.

Accordingly, we find that Wells has failed to make out one of the key elements of a § 1983 "failure to intervene" claim, i.e., the opportunity for Ciochon and Pellerito to prevent harm from befalling Wells. Thus, the district court appropriately granted Ciochon and Pellerito's motion for summary judgment as to that claim.

**IV**

Wells next alleges a state-law claim of assault and battery against Mueller and a state-law claim of gross negligence against all three officers. The district court granted the defendant officers' motion for summary judgment on both of these claims, relying on its earlier finding regarding Wells's §1983 claims   that all three officers' actions were objectively reasonable   to dispense with Wells's state-law claims as well.

**A**

Under Michigan law, "a police officer may use reasonable force when making an arrest." *Brewer v. Perrin*, 349 N.W.2d 198, 202 (Mich. Ct. App. 1984) (citing *Firestone v. Rice*, 38 N.W. 885 (Mich. 1888)). Michigan courts define reasonable force as "that which an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary," *ibid.* (internal quotation marks omitted), thus, "the standard is an objective one under the circumstances," *VanVorous v. Burmeister*, 687 N.W.2d 132, 141 (Mich. Ct. App. 2004). Accordingly, if a police officer's actions are objectively reasonable under the circumstances, he cannot be held liable for assault and battery under Michigan tort law. *Id*. at 142.

In granting Mueller's motion for summary judgment on Wells's assault-and-battery claim, the district court relied on its holding, made with respect to Wells's § 1983 claim, that Mueller had not engaged in excessive force. Because the district court held that Mueller's actions were

objectively reasonable and thus did not constitute excessive force in violation of § 1983, it similarly held that Mueller's actions could not constitute assault and battery under Michigan law.[3]

We have reversed the district court's decision as to Mueller's tasing of Wells, however, and held that, viewing the facts in the light most favorable to Wells, the tasing was an excessive use of force that was not objectively reasonable under the circumstances. *See supra* Section III.B. Accordingly, we also reverse the district court's related holding that Mueller's tasing of Wells could not constitute assault and battery under Michigan law, as it was premised on the same incorrect finding of objective reasonableness. We leave in place, however, the district court's grant of summary judgment as to the portion of Wells's state-law assault-and-battery claim based on Mueller's kneeing Wells to the ground, as we, like the district court, have found that that action was objectively reasonable under the circumstances. *See supra* Section III.B.

**B**

Government employees can also be held liable for gross negligence under Michigan tort law. Mich. Comp. Laws § 691.1407(2)(c). Gross negligence is defined by statute as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws.

---

[3] The district court appears to have equated the objective-reasonableness standard used to assess officer liability for a § 1983 excessive-force claim with the objective-reasonableness standard used to determine whether an officer has committed assault and battery under Michigan tort law. While the district court did not provide any support for this course of action, it appears that Michigan courts do indeed view the two standards as equivalent. *See VanVorous*, 687 N.W.2d at 142 ("To find for plaintiff on [his assault-and-battery] claims, our courts would have to determine that the officers' actions were not justified because they were not objectively reasonable under the circumstances. Because the federal district court reached and decided the question [in resolving plaintiff's § 1983 excessive-force claim], further litigation regarding this issue was collaterally estopped." (internal citation omitted)).

§ 691.1407(7)(a). In granting all three officers' motion for summary judgment on Wells's gross-negligence claim, the district court again relied on its holding, made with respect to Wells's § 1983 claims, that all of the officers' actions were objectively reasonable and thus could not constitute gross negligence.

As with Wells's state-law assault-and-battery claim against Mueller, the district court appropriately held that Mueller's kneeing Wells to the ground was objectively reasonable and thus could not constitute gross negligence. As mentioned earlier, however, the district court erred in holding that Mueller's tasing of Wells was objectively reasonable conduct. That said, under Michigan law, Wells cannot bring a gross-negligence claim that is premised on Mueller's alleged assault and battery of Wells. Michigan courts have repeatedly "rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence." *VanVorous*, 687 N.W.2d at 143; *see also Smith v. Stolberg*, 586 N.W.2d 103, 104 05 (Mich. Ct. App. 1998); *Sudul v. City of Hamtramck*, 562 N.W.2d 478, 479 (Mich. Ct. App. 1997). In *VanVorous*, the plaintiff filed claims of assault and battery and gross negligence against defendant police officers who shot and killed her husband. *VanVorous*, 687 N.W.2d at 137. The Michigan Court of Appeals expressly held that because "plaintiff's claim of gross negligence is fully premised on her claim of excessive force[,] . . . plaintiff did not state a claim on which relief could be granted." *Id*. at 143. Thus, we hold that Wells's allegations of gross negligence against Mueller, arising from the same intentional acts on which he bases his state-law assault-and-battery claim, do not state a claim for which relief can be granted. As such, that claim was properly dismissed.

With regard to the gross-negligence claim against Ciochon and Pellerito, Wells's only argument is that Ciochon and Pellerito were grossly negligent when they failed to intervene. It is true that a federal district court in Michigan has recognized a cause of action for gross negligence under Michigan law where an officer fails to intervene on behalf of an arrestee being subjected to excessive force. *See Philpott v. City of Portage*, No. 4:05-CV-70, 2006 WL 2385316, at *7 (W.D. Mich. Aug. 17, 2006). But we have already held, as the district court did, that Ciochon and Pellerito did not have the opportunity to prevent Mueller's use of force against Wells and thus that their behavior was objectively reasonable. *See supra* Section III.C. Wells cites *Philpott* to support the conclusion that Ciochon and Pellerito were grossly negligent, but in that case, the officers ignored *ongoing conduct* that they had the opportunity to prevent. *Philpott*, 2006 WL 2385316, at *7 (holding that an officer "could have prevented [the arrestee's] injuries by adjusting or removing the handcuffs" that were applied too tightly). Given the nature of the force applied by Mueller in the instant case, Ciochon and Pellerito had no opportunity to intervene and prevent injury to Wells. *See supra* Section III.C. Thus, we agree with the district court that such conduct cannot constitute gross negligence under Michigan tort law.

## V

Finally, Wells alleges a § 1983 claim against the City for failure to train / supervise its officers. The district court found that because "none of the individual Defendants violated Plaintiff's constitutional rights, Plaintiff cannot maintain his municipal liability claims." As we have now determined that Mueller was not entitled to summary judgment on the basis of qualified immunity with respect to his tasing of Wells, *see supra* Section III.B, the premise on which the district court

relied when granting summary judgment for the City is no longer valid. We therefore must remand Wells's claim against the City to the district court for further consideration in light of our other holdings.

## VI

For the foregoing reasons, we REVERSE the district court's grant of summary judgment to Mueller on Wells's § 1983 claim and state-law assault-and-battery claim, but only to the extent that those claims are based on the tasing of Wells. Because the district court dismissed Wells's § 1983 failure-to-train / supervise claim against the City purely on the ground that he had failed to state a constitutional claim against the defendant officers, we REMAND Wells's claim against the City in light of our decision regarding Mueller. We AFFIRM all other decisions of the district court.

McCALLA, Chief District Judge. I agree with the majority's opinion except as to its discussion of officer Patrick Mueller's tasing of Robert Wells. The opinion adopts Wells's version of the facts as true when analyzing Mueller's tasing of Wells.

Adopting a plaintiff's version of the facts as true is appropriate when reviewing a denial of qualified immunity on interlocutory appeal. Allowing an interlocutory appeal of a denial of qualified immunity on summary judgment protects an official's qualified immunity from suit. *See Moldowan v. City of Warren*, 578 F.3d 351, 369 (6th Cir. 2009) ("[T]he qualified immunity privilege entitles a party to '*immunity from suit* rather than a mere defense to liability,' and thus 'is effectively lost if a case is erroneously permitted to go to trial.'" (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Such interlocutory appeals, however, are limited to issues of law. *See Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) ("A district court's denial of qualified immunity is an appealable final decision under 28 U.S.C. § 1291 only 'to the extent that it turns on an issue of law.'" (quoting *Mitchell*, 472 U.S. at 530)); *Berryman v. Rieger,* 150 F.3d 561, 563 (6th Cir. 1998) (stating that, on interlocutory appeal, "[t]o permit jurisdiction over fact-intensive questions of qualified immunity . . . would undercut the expertise of trial courts, invite delay, and waste appellate resources on the same issues that will arise after trial" (citing *Johnson v. Jones*, 515 U.S. 304, 316-17 (1995))). Accordingly, because the facts are usually in dispute when a motion for summary judgment is denied, taking the facts "in the light most favorable" to the plaintiff "usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotation marks omitted). Accordingly, the plaintiff's facts are adopted as true when

qualified immunity is denied at the summary-judgment stage because allowing an interlocutory appeal is necessary and interlocutory appeals are limited to issues of law.

In the instant case, however, the district court granted summary judgment to Mueller on the ground of qualified immunity. In such a situation, an appeal is not interlocutory and need not be limited to questions of law. Accordingly, when reviewing the district court's decision on appeal, viewing the evidence "in the light most favorable" to the plaintiff may still result in the court finding a genuine issue of material fact for trial. *See King v. Taylor*, 694 F.3d 650, 662 (6th Cir. 2012) (reviewing a grant of summary judgment on the ground of qualified immunity and holding that, "[v]iewing the record in the light most favorable to plaintiffs, we conclude that a factual dispute exists . . . ."); *Parsons v. City of Pontiac*, 533 F.3d 492, 503 (6th Cir. 2008) (reviewing a grant of summary judgment on the ground of qualified immunity and holding that "[w]e ultimately conclude that this evidence, when viewed in the light most favorable to [the plaintiff], is *not* susceptible to only one reasonable determination . . . .").

Regarding Mueller's tasing of Wells, there are genuine issues of material fact as to whether Mueller employed excessive force when he tased Wells. The district court's opinion indicates that Mueller and Wells gave deposition testimony that is contradictory. (R. 60 at PageID 856-61.) If Mueller's deposition testimony is believed, Mueller did not employ excessive force by tasing Wells. *See Abdul-Khaliq v. City of Newark*, 275 F. App'x 517, 521 (6th Cir. 2008) (finding that application of one dose of pepper spray was objectively reasonable when the plaintiff was verbally abusive and threatening). If, however, Wells's deposition testimony is believed, Mueller did employ excessive force by tasing Wells. *See Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 498-99 (6th Cir.

2012) ("[T]he use of non-lethal, temporarily incapacitating force on a handcuffed suspect who no longer poses a safety threat, flight risk, and/or is not resisting arrest constitutes excessive force."); *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006) ("A jury could find that a reasonable officer would not have reacted this forcefully to a handcuffed man [by throwing him to the ground face first, when the man] showed no signs of noncompliance until his pet was killed in front of his family.").

These genuine issues of material fact require resolution by the factfinder. *See Alspaugh v. McConnell*, 643 F.3d 162, 168 (6th Cir. 2011) ("When reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited." (internal quotation marks omitted)). Accordingly, taking the evidence "in the light most favorable" to Wells, I would find that genuine issues of material fact preclude the court from affirming summary judgment as to whether Mueller's tasing of Wells constituted excessive force. *See King*, 694 F.3d at 664 ("Genuine disputes of material fact preclude upholding the district court's entry of summary judgment on Taylor's defense of qualified immunity.").